JAMES C. ABBOTT v. STEPHANY POULTRY COMPANY.

514

*(November 15, 1948.)*

LAYTON, J., sitting.

*James M. Tunnell, Jr.,* for Plaintiff.

*Caleb M. Wright* for Defendant.

Superior Court for Sussex County, No. 11, February Term, 1948.

unclass

516

LAYTON, J.

The letter of November 8, 1944 was not a valid contract of itself. It was unilateral in form and lacked consideration because Plaintiff could have delivered "broilers" or not, as he saw fit. Williston, Vol. 1, § 58. As long as the offer remained open, Defendant was bound to accept and pay for such deliveries of "broilers" as Plaintiff chose to make. Conversely, Defendant was free at any time to notify Plaintiff that its outstanding offer was cancelled. *Holloway v. Mountain Grove Creamery Co.*, 286 *Mo.* 489, 228 *S.W.* 451. But whether, in a unilateral agreement of this sort, a promisor may cancel his outstanding offer subsequent to partial performance on the part of the promisee is one of the most debatable subjects in the law of contracts. The Mountain Grove Creamery Co. case is no authority for this proposition because, there, Defendant's notice of cancellation preceded the deliveries of the milk the contract price of which was in controversy.[1]

A study of the numerous text authorities and decisions convinces me that there are but two approaches to the question (1) Regardless of the equities, to apply strictly the principles of law peculiar to unilateral contracts—that is, to treat them as offers calling for completed acts and, so long as the required act remains but partially performed, then subject to the right of cancellation by the offeror (2) To weigh the equities and, when the offeree has suffered a serious detriment or disadvantage in undertaking, but has been

---

[1] Defendant offered to pay a certain price over the market for milk delivered by Plaintiff for a year. Thereafter, Defendant notified Plaintiff it would pay only the market price. Plaintiff refused to accept the cancellation and continued to deliver milk. The suit was for the contract price of the milk delivered after Defendant's notice of cancellation. Recovery was denied.

unable to complete, the performance sought by the offer, then, to treat the part performance by offeree as giving rise to a consideration which will convert the unilateral offer into an enforceable, bilateral contract.

██ Though a rare occurrence, today, the unilateral contract is clearly recognized in our system of law. The consideration for a unilateral promise is "a detriment incurred by the promisee or a benefit received by the promisor at the request of the Promisor." Williston, Vol. 1, § 102; or, stating it even more simply, an offer calling for a completed performance. I see no possibility of construing the letter of November 8, 1944 as other than unilateral. As I interpret this agreement, the Defendant was interested in the delivery of "broilers" from time to time, not in the offeree's act of putting in baby "chicks" for future delivery if, indeed, he thereafter chose to make delivery at all. In a case of this sort many respectable authorities on the subject seem to support promisor's right to cancel his offer with impunity at any time until a complete performance has been tendered him. Some of the decisions are collected in Williston, Vol. I, § 60 A, Note 2, page 168. In *Stensgaard v. Smith,* 43 *Minn.* 11, 44 *N.W.* 669, 670, 19 *Am.St.Rep.* 205 promisor gave promisee the exclusive right for 90 days to make sale of certain real estate at a specified commission. Promisee used his best efforts to make sale thereof but before succeeding, promisor himself sold it. Upon a suit by promisee for damages for breach of contract, the Supreme Court of Minnesota had this to say: "This instrument, executed only by the defendant, was effectual, as we have said, as a present, but revocable, grant of authority to sell. It involved, moreover, an offer on the part of the defendant to contract with the plaintiff that the latter should have, for the period of three months, the exclusive right to sell the land. This action is based upon the theory that such a contract was entered into; but, to constitute such a contract,

it was necessary that the plaintiff should in some way signify his acceptance of the offer, so as to place himself under the reciprocal obligation to exert himself during the whole period named to effect a sale. No express agreement was shown. The mere receiving and retaining this instrument did not import an agreement thus to act for the period named, for the reason that, whether the plaintiff should be willing to take upon him that obligation or not, he might accept and act upon the revocable authority to sell expressed in the writing; and if he should succeed in effecting a sale before the power should be revoked, he would earn the commission specified. In other words, the instrument was presently effectual, and of advantage to him, whether he chose to place himself under contract obligations or not. For the same reason the fact that for a day or a month he availed himself of the right to sell conferred by the defendant, by attempting to make a sale, does not justify the inference, in an action where the burden is on the plaintiff to prove a contract, that he had accepted the offer of the defendant to conclude a contract covering the period of three months, so that he could not have discontinued his efforts without rendering himself liable in damages. In brief, it was in the power of the plaintiff either to convert the defendant's offer and authorization into a complete contract, or to act upon it as a naked revocable power, or to do nothing at all. He appears to have simply availed himself for about a month of the naked present right to sell, if he could do so. He cannot now complain that the landowner then revoked the authority, which was still unexecuted. * * *"

To the same effect are *Roberts v. Harrington,* 168 *Wis.* 217, 169 *N.W.* 603, 10 *A.L.R.* 810; *Elliott v. Kazajian,* 255 *Mass.* 459, 152 *N.E.* 351; *Sonino v. Magrini,* 225 *App.Div.* 536, 234 *N.Y.S.* 63, and *Petterson v. Pattberg,* 248 *N.Y.* 86, 161 *N.E.* 428. None of these cases rests upon facts such as here but the expressed principles are clear. Nor does Mr.

Williston deny that, in theory, the right always exists in the promisor to revoke until a complete performance has been tendered. Thus, in § 60, Vol. 1, he states:

"It seems difficult on theory successfully to question the power of one who offers to enter into a unilateral contract to withdraw his offer at any time until performance has been completed by the offeree, but great injustice may arise if the offeror's power of revocation continues so long. For instance, if A offers one hundred dollars if B will complete a piece of work, and B sets about the work and nearly finishes it, it is a hardship upon B if, while the work is still incomplete, A may revoke his offer. Yet to say that the beginning of work by B amounts to an assent binding both A and B to the performance and payment is to change the hypothesis that A offered not to make a bilateral contract but a unilateral one in which not part but all the act requested was to be the consideration, and in effect to deny the right of an offeror to dictate the terms of his offer. * * *

"But the case supposed is one where the offer is so clearly for the formation of a unilateral contract, requiring prolonged performance, that no other reasonable interpretation is possible than that the offeror demands as an exchange for his promise, not a promise but a completed act. After the offeree has begun to perform under such an offer he may unquestionably stop performance halfway if he concludes that after all he does not care to enter into the contract, and if the offeror also may not revoke at that time he seems bound by a promise for which he has not received, and may never receive, the consideration requested, since the whole transaction is still optional with the offeree."

On the other hand Mr. Williston does not approve of the harsh results which may obtain as a result of the right of the promisor to revoke after the promisee has undertaken, but not fully performed, the requested act. His solu-

tion is suggested in § 60 A of Vol. I, as follows: "The difficulty may best be met and the hardship avoided of denying relief to the offeree by holding, if the consideration requested in an offer of a unilateral contract will necessarily take time and expense for its performance, that the offer contains by implication a subordinate offer to keep the main offer open for a reasonable time in consideration of the beginning of performance of the offeree."

This theory finds support in certain law journals and texts. See note 6, § 60 A, Vol. I, page 170. At least one text writer has stated that a part performance by the promisee should create an estoppel in pais. 23 Harvard Law Review 159 (selected readings page 293). The substantial majority of the cases seem to treat a part performance of a unilateral offer as though the acceptance of a bilateral agreement. Ward v. Ward, 96 Utah 263, 85 P.2d 635, 642; Hughes v. Bickley, 205 Ala. 619, 89 So. 33; Braniff v. Baier, 101 Kan. 117, 165 P. 816, L.R.A.1917E 1036; Brackenbury v. Hodgkin, 116 Me. 399, 102 A. 106; Edwards v. Roberts, Tex.Civ.App., 209 S.W. 247 and cases therein cited at page 251. See also cases cited in Notes 3, 4 and 5, Williston, Vol. I, § 60 A, page 169.

After careful reflection I have concluded that a part performance of the terms of a unilateral offer affords the consideration necessary to support a binding contract. While to some extent disturbing the ancient principles of law applicable to unilateral offers, this result not only has the support of the weight of authority but also is in accord with common principles of justice. The degree of performance necessary to constitute a valid consideration must necessarily rest upon the facts of each case. Here, acting in reliance upon an unrevoked unilateral offer, Plaintiff purchased and put into houses 7,000 baby "chicks" for future delivery to Defendant, thereby incurring a substantial detriment.

I am of the opinion that this act constituted a part performance sufficient to convert the unilateral offer into a binding, bilateral agreement from which Defendant could not extricate himself by the subsequent revocations on October 13, 1945 and January 1, 1946.

██ I now turn to Plaintiff's contention that, even conceding that he did agree to the subsequent modifications of the contract price, on October 13, 1945 from the ceiling price to 27¢ per pound, and on January 1, 1946, to 1¢ per pound above the market, nevertheless, such agreements, being parol, come within the prohibition of the Statute of Frauds. I do not agree with this contention nor do the cases cited support it. It is true that Williston, Vol. 2, § 598 seems to say that where the promisee under a binding bilateral agreement is, in effect, coerced into accepting a parol modification of the written agreement because promisor refuses to perform it, the parol modification is invalid under the Statute of Frauds. But all the cases cited by Mr. Williston rest upon facts where the contract was, in fact, never executed under the terms as modified by parol. In this case, the contract was executed by the delivery of the "broilers" and payment therefor. If, on January 1, 1946, Plaintiff agreed to a reduction in the price of "broilers" to 1¢ per pound over the market, delivered them to defendant and received 22½¢ per pound therefor, that is an end to the matter for the Statute of Frauds does not apply to executed contracts. Williston, Vol. 2, § 593.

To summarize, Plaintiff, by partly performing Defendant's open offer of November 8, 1944, converted it from a unilateral into a binding bilateral agreement under which Defendant is liable unless, in fact, Defendant's revocation of the offer on October 13, 1945 preceded the purchase of the "chicks" here involved or, unless it should be hereafter found that Plaintiff agreed to the modification of price to 22½¢

per pound. If this suit is tried in accordance with the principles here stated, there should be but three main issues for the jury, (1) The date on which Plaintiff obligated himself for the delivery of 7,000 "chicks" (2) Whether Plaintiff on October 13, 1945 agreed to the modification of price from the ceiling price to 27¢ per pound and (3) Whether on January 1, 1946 Plaintiff agreed to a reduction in price to 1¢ above the market.

Plaintiff's motion for summary judgment is denied. It follows from what has here been said that Defendant's motion for summary judgment is likewise denied.